IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

*******

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 12-12-H-CCL |
| Plaintiff, | |
| -vs- | FINDINGS OF FACT, CONCLUSIONS OF LAW, & ORDER |
| MIKE KURT CHILINSKI, | |
| Defendant. | |

*******

Before the Court is Defendant's Motion to Suppress Evidence and Motion to Suppress Non-Miranda Statement. The Motions to Suppress are opposed by the government. A suppression hearing was held on the motions on October 10, 2012. The government was represented by AUSA Paulette Stewart. Defendant Chilinski was represented by his defense counsel, Michael Donahoe. The Court, having received the testimony and arguments, and having reviewed all the record, is prepared to rule.

## Background

Defendant Mike Chilinski owns several acres of real property outside of Jefferson City, Montana. Defendant's residence is located on this rural property, reached by a one-mile road (Malamute Way) in a wooded area. There is a fence at least partially or fully surrounding the residence, with a gate across the road.

Defendant considers himself to be one of the world's top breeders of Alaskan Malamute dogs. Until mid-October, 2011, Defendant owned and operated a kennel containing between 100 and 200 Malamute dogs. The kennel was located between the fence perimeter and the residence (but perhaps to some degree actually within the residence). To either side of the residence, apparently haphazardly situated, were a plethora of make-shift pens composed mostly of chain-link fencing and panels but also including some outbuildings and garages. All of these pens and structures comprised the Defendant's kennel facility.

On October 12, 2012, the Jefferson County Sheriff's Office ("JCSO") executed a search warrant on Defendant's property, seeking evidence relating to a charge of animal cruelty. At the same time, the JCSO executed an arrest warrant against Defendant Chilinski on the animal cruelty charge. During the execution of the animal cruelty search warrant, dozens of marijuana plants were found on the

property.  JCSO therefore contacted the Southwest Montana Drug Task Force ("SWMDTF"), which in turn prepared an application for a search warrant to search for and seize the marijuana plants, which was granted and executed on the same day, October 12, 2012.  During that next day, October 13, additional marijuana plants were discovered growing on the property by Sheriff Doolittle, and so the SWMDTF obtained a second search warrant for the property, which was granted and executed on the following day, October 14, 2012.  A total of over three hundred plants were found on the property.  Defendant now seeks to suppress all of the marijuana plants on the argument that they are the fruit of multiple illegal searches.  Defendant also seeks to suppress his non-Mirandized statement given shortly after his arrest.  The government concedes that suppression of Defendant's non-Mirandized statement is appropriate.

1.  Motion to Suppress the Marijuana Plants.

Defendant argues that the marijuana plants seized during the October 12-14, 2011, searches should be suppressed because (1) JCSO Deputy Chad McFadden's application for the animal cruelty search warrant failed to show probable cause, and therefore the JCSO was illegally on the property when it discovered the

marijuana plants, (2) Dep. McFadden's application contained allegations based on illegal unwarranted searches conducted on June 10-11, 2011, and (3) Dep. McFadden's application contained falsehoods and omitted material information negating probable cause. Defendant Chilinski concludes that all the information contained in the SWMDTF's application for search and seizure of the marijuana plants was tainted by the illegal animal cruelty searches in June, August, and October, 2011.

The Court will take Defendant's allegations in chronological order. First, Defendant argues that JCSO Deputy Dean Hildebrand visited the property on June 10 and on June 11, 2011, and on the latter day conducted an illegal warrantless search which was coercive and lacking in probable cause.

June 10, 2011, Viewing of Property. On June 10, 2011, Dep. Hildebrand visited the Chilinski property by driving up Malamute Way to the closed gate. Dep. Hildebrand explains on the 6 minute video he recorded that he is responding to complaints made to the JCSO of malnutrition and neglect at the kennel. (Doc. 31 (Exhibit 4, CD-Rom filed conventionally).) At the closed gate, Dep. Hildebrand exits his vehicle and walks the fence line a short distance, less than 50 feet, by walking next to the road along the fence line. The pens are only a few feet

away from the road.  Dep. Hildebrand's video focuses on the dog pens

immediately on the other side of the chain link fence.

Defendant Chilinski asserts that Dep. Hildebrand's June 10, 2011, visit to

his property constituted a warrantless search of the property "within the curtilage."

(Doc. 23 at 2.)  Curtilage is "the land immediately surrounding and associated with

the home."  *Oliver v. United States*, 466 U.S. 170, 180, 174 S.Ct. 1735, 80 L.Ed.2d

214 (1984).  The curtilage is considered to be part of the home for Fourth

Amendment purposes.  *Romero-Bustamante*, 337 U.S. at 1107.  However, a

warrantless observation into the curtilage from outside of the curtilage is

reasonable under the Fourth Amendment.  *See California v. Ciraolo*, 476 U.S.

207, 106 S.Ct. 1809 (1986) (aerial observation by law enforcement into curtilage

reasonable under Fourth Amendment).   Indeed, such law enforcement

observations made into the curtilage may properly provide the basis for probable

cause to support a warrant to search the curtilage.  *Id.* at 213-14.

In this case, the area between the fence and the Chilinski residence is a road

that loops in a circle.  As the video footage shows, Defendant parks his vehicle(s)

on the looping road in front of his house, and presumably his customers park their

vehicles on the loop as well. Surrounding the perimeter, on the fence line, are

numerous dog pens. Quite clearly, on June 10, 2011, Dep. Hildebrand never entered the curtilage surrounding Defendant's residence. *See United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (establishing four factors: (1) proximity of area to home, (2) whether area is enclosed, (3) nature and uses of the area, (4) steps taken by resident to protect the area from observation by people passing by). The dog pens were within the enclosed chain-link fence perimeter, and Dep. Hildebrand was on the other side of the fence. Defendant took no steps to protect the dog pens from observation through the chain-link fence. Having made no attempt to shield the dog pens from observation, Dep. Hildebrand's observation of the dog pens from outside Chilinski's chain-link fence was reasonable for Fourth Amendment purposes, and his observations could properly be utilized to show probable cause for a search warrant.

June 11, 2011, Consent Search. Dep. Hildebrand again visited the property the next day, on June 11, 2011. Again, his visit to the property was recorded by video and audio recording. (Doc. 31 (Exhibit 4, CD-Rom filed conventionally).) This time, the gate was unlocked, and Defendant Chilinski was standing on the looped road in front of his house. Dep. Hildebrand walked down the road to talk to Chilinski. Although the conversation is occasionally inaudible due to barking

dogs, for the most part the entire interaction between the two individuals is audible.  In addition, the interaction is recorded in its entirety, and because the body language and actions of the Defendant are clearly observable, it is thus possible to draw factual and legal conclusions from the audio-visual recording.

The Court has carefully scrutinized the recording of Dep. Hildebrand's June 11, 2011, visit to the Chilinski kennel.  It is a thirty-three minute recording that begins with the law enforcement vehicle on the road approaching the gate in front of Defendant's residence.  The grass on either side of the road contains weeds and tall grasses, and felled trees are scattered randomly alongside the downhill side of the road.  The gate is wide open and the Dep. Hildebrand's vehicle passes through the gate easily.  The dirt road between the gate and the residence loops around in a circle.  The distance between the gate and the residence is approximately 50 to 100 feet.  Outside the gate and fence there are large items of old equipment or materials piled around haphazardly.  Inside the gate there are piles of rubble, piles of wood, a ceramic sink, old pieces of metal, appliances, equipment, gas cans, and buckets.  The area between the gate and the residence looks like a junk yard.  Chilinski is standing directly in front of his front door, blow-drying the fur of a small dog sitting on a table.

The interaction between Dep. Hildebrand and Chilinski begins in a cordial manner, with smiles and laughter, but Chilinski immediately asks if there is a problem, and Dep. Hildebrand tells him that they have received about four more complaints about the dogs. Dep. Hildebrand asks, "Would you mind showing me around again?" Chilinski replies, "Uh, no, uh-uh [no]." Chilinski adds, "I'm not doing too well 'cause I have a foot, that, you see, I'm not doin' too well with. You see, my foot is black-and-blue [taking his sock off and showing his foot]." Dep. Hildebrand comments, "Oh, that ain't good." Chilinski explains, "I'll be kinda slow," and Hildebrand replies, "That's fine." Chilinski points out that "You know, last time they were here, they had a vet doctor all the dogs..." Hildebrand interrupts by saying, "Right, and that was quite a while ago, and I was here for that." After some conversation in which Chilinski explains that the complaints to JCSO are coming from PETA, Dep. Hildebrand says, "Well, why don't ya, if you would, show me around again, and we'll go from there. Okay?" Chilinski replies, "All right." Chilinski then leads the way, giving Dep. Hildebrand a lengthy guided tour through the kennels, both men trying to count the number of dogs along the way. Chilinski states that there about 100 dogs at his kennel.

As Dep. Hildebrand and Chilinski walk through the contiguous dog pens,

one can see that the pens are not roofed and the floor of the pens are dirt.  There

appears to be no food in any of the pens.  However, each pen provides at least one

shelter to the dogs by various methods:   in one pen boards are leaned together to

form a make-shift A-frame enclosure, in another pen a pickup-camper cover sits

on the dirt with its windows open, there are traditional dog "igloos" in other pens,

finally, there are miscellaneous shelters such as wooden crates or tarps.  Each pen

appears to have a water bucket, trough, or blue plastic 'kiddy' swimming pool,

although some of the buckets are knocked over and obviously empty, and some of

the containers do not have clean water or are livestock troughs not suitable for

dogs.  There are wooden pallets strewn throughout the pens, as well as downed

trees and branches and other debris, such as metal drums and trash. There is much

debris in or around the pens (old sinks, tires, wood, doors used to build enclosures,

trash, etc.).  The over-all appearance of this kennel is make-shift and fairly chaotic.

One dog was limping with an injured foot.  Another dog is found stuck in a gate.

Dep. Hildebrand and Chilinski find a dead malamute in one of the pens, and its

pen-mate has been drawing blood on it.  Chilinski explains that this 5-year-old

male dog was not dead the day before and that  "maybe he overate or something."

Dep. Hildebrand asks, "Why do all your dogs have diarrhea?"  Chilinski replied,

"because I just changed foods this week from Duralife to Attaboy, which is corn-based. I just did that 3 days ago. And any time you change foods you can get diarrhea." Dep. Hildebrand notes (in view of the dead animal) that Chilinski must not have not walked through the kennel yet that day. Chilinski agrees, but he also claims that he had only lost one other dog, and that was five years before.

At the conclusion of the visit, Dep. Hildebrand tells Defendant that the conditions of his kennel have not improved since the last JCSO investigation two years before (in 2009), and if anything the conditions at the kennel had deteriorated since that time. ("I'm going on my personal experience, Mike, and it's went down, it really has, in my opinion. And it's going to bite you in the butt, you know, if you don't do something about it.") Chilinski acknowledges that he "can and should" clean up his kennels, and he asks Dep. Hildebrand his opinion whether Chilinski has broken any laws. Dep. Hildebrand replies, "In my opinion? You are borderline for animal cruelty here, if you are not already there." Chilinski admits that just feeding and watering the dogs is a full-day's work, that he has had a hurt foot that has slowed him down, and that he needs to get help with the care of the dogs. Dep. Hildebrand very clearly tells Chilinski that conditions at the kennel are unacceptable, that Chilinski needs to clean the kennels and remove all

the feces and debris in them.  Dep. Hildebrand tells Chilinski that he will return in

several weeks to check to see if that clean-up has been accomplished.

August 13, 2011, Consent Search.  Dep. Hildebrand returned to the property

on August 13, 2011.  Dep. Hildebrand parks his vehicle outside the gate and walks

onto the property.  Upon knocking on the door and speaking with Chilinski, Dep.

Hildebrand asks whether Chilinski would show him around the kennel again.

Chilinski explains that he has to go into town in 10 minutes, but he adds, "do you

want a quick look?"  Dep. Hildebrand replies, "That'll be fine.  I'll take it."  Dep.

Hildebrand suggests that they look at the pens in and around an outbuilding

located near the residence.  Dep. Hildebrand informs Defendant Chilinski that he

is recording their conversation, both video and audio.

Once again, the pens are littered with junk and what appears to be a large

amount of feces that has been trampled over a long period of time.  One dog is

noted to have a wound from a scuffle with another dog.  Dep. Hildebrand explains

that he has gotten another complaint about the kennel, which is why he is visiting

the property again.  At the end of the visit, Chilinski tells Dep. Hildebrand about

the progress he has made on constructing two rental apartments in the upstairs of

his house and in his basement.[1]  Dep. Hildebrand responds, "Can you show me?"

Chilinski replies, "The rental? I gotta go.  You can... maybe next time [smiling and

chuckling]."  Dep. Hildebrand then asks, "Would you sign a consent to search?"

Chilinski replies, "No."  Dep. Hildebrand tells Chilinski that he will inform his

superiors regarding the visit and let them "make the decision."  Chilinski says that

he is being harassed, and Dep. Hildebrand tells him that he (Hildebrand) has to

answer the complaint received in the past day or two.  Dep. Hildebrand points out,

"As long as we keep having complaints, we have to answer the complaints."

Finally, Dep. Hildebrand asks where Chilinski disposes of his dead dogs,

and Chilinski explains that he buries them (about eight per year from natural

causes) wherever he can find a suitable bit of soft ground on the property in a

shallow burial, usually with lime.


Marijuana Search Warrants

First Marijuana Warrant.  On October 12, 2011, as the JCSO personnel

_____

[1]    The JCSO received an animal-cruelty/neglect complaint on August 11,
2011, that also reported unclean conditions inside the residence due to the smell
and dog excrement everywhere.  The August 11 complainant expressed concern
about the welfare of a child living at the residence.

began the time-consuming process of seizing over 160 Malamute dogs, law enforcement began to discover marijuana plants on Defendant's property. Specifically, on his initial walk-through of the residence, Sheriff Craig Doolittle found both dogs and marijuana plants on the deck in back of the house, in the house, and on the second-story deck of the house. Sheriff Doolittle contacted the Southwest Montana Drug Task Force (SWMDTF) to report the finding of the marijuana plants. The SWMDTF application for search warrant explains that Sheriff's Deputies found "over thirty marijuana plants of various sizes and heights as well as several grow lights" in an open garage where dogs were located. Deputies also found numerous marijuana plants growing in the residence, as well as a drying room containing "scores" of marijuana plants. Underneath the house, there was also a "grow room" emitting a bright light and smelling of marijuana; this room contained marijuana plants. Law enforcement found over eighty plants in pots in the residence and the outbuildings on October 12. Because one plant was found growing 50 yards from the residence, the application for search warrant requested that further search be permitted as to "the premises, residence, kennels, garages and outbuildings" on Defendant's property. (Doc. 20, App. 87-88.) The search warrant application was granted on October 12, 2011, and the search

warrant was executed on that same day by SWMDTF personnel.

Second Marijuana Warrant.  The first marijuana search warrant yielded the discovery of a total of 217 plants by SWMDTF on October 12, 2011.  On October 13, 2011, as Sheriff Doolittle was still at the property investigating and collecting animal cruelty evidence, he discovered an additional grow area on the property (about 40 yards from the kennels) that had not been discovered the previous day by SWMDTF.  (Doc. 20, App. 103.)  After being informed of this new discovery, SWMDTF sought and obtained a second marijuana search warrant on October 13, 2011.  On October 14, 2011, the second warrant was executed and 100 additional marijuana plants were seized.

Findings of Fact

The Court has examined the Declaration of Defendant Chilinski (Doc. 21) and all the testimony, affidavits, and evidence presented by the parties.  The Court finds Defendant's Declaration to be self-serving and not corroborated by other more reliable evidence, and the Court rejects the same, particularly as to Defendant's version of his interaction with the Petersons in September, 2011,  and with Dep. Hildebrand in June, 2011.  The Court specifically rejects Defendant's

version of the question posed by Dep. Hildebrand on October 12, 2011. (Doc. 21 at 5, ¶ 13.) The Court finds the testimony and affidavits of Dep. Hildebrand, Dep. McFadden, and Sheriff Doolittle to be credible, and the Court accepts the same. Similarly, the Court finds the affidavits of William and Carole Peterson to be credible, and the Court accepts the same.

Conclusions of Law

A court reviewing the issuance of a search warrant should uphold the issuance if the issuing judge had a substantial basis for concluding that probable cause exists to believe that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 246, 103 S.Ct. 2317 (1983). The 'substantial basis' standard of review is meant to show great deference to the issuing judge's probable cause determination. *United States v. Seybold*, 726 F.2d 502, 503 (9th Cir. 1984). Probable cause means that there is a 'fair probability' that contraband or evidence of a crime is located in a particular place. This is a 'commonsense, practical question,' and neither certainty nor a preponderance of the evidence is required. *Illinois v. Gates*, 462 U.S. at 246.

Clearly, the June 11 and August 13, 2011, searches were consensual. There is absolutely no indication given by Chilinski that he did not want to show Dep. Hildebrand around the kennel or that he felt coerced by Hildebrand into doing so. Dep. Hildebrand never showed his firearm and never threatened to get a search warrant. The visits were friendly and conversational, not confrontational. All of the information obtained during these visits to the kennel was properly available to JCSO in an application for a search warrant. Indeed, the application for the search warrant itself properly describes the deplorable conditions on the property as viewed by Dep. Hildebrand on June 11 and August 13, 2011. (Doc. 20, App. 66.)

Moreover, the application for the search warrant contained an independent basis for probable cause because it cited the September 15, 2011, complaint of William "Bill" Peterson and Carole Peterson, of Nye, Montana, who purchased a puppy from Defendant on September 13, 2011. The Petersons took their new puppy to their veterinarian, Rex Anderson, D.V.M. in Absarokee, Montana, who found the puppy to be malnourished, the puppy's belly filled with fluid, and the puppy's hip and spine abnormal. The complaint filed by both of the Petersons recounts what they describe as "filthy," and "horrific conditions" for the dogs at

Chilinski's kennel.[2]

Citizen witnesses (as opposed to professional informants) are generally presumed to be reliable. *See United States v. Banks*, 539 F.2d 14, 17 (9th Cir. 1976). The Petersons were eye-witnesses to the conditions of the kennel and the dogs. The Petersons explained that they took their puppy to their veterinarian, who found signs of malnourishment in the puppy. However, for the Peterson's complaint to be deemed reliable, it was not necessary that the Petersons' complaints be corroborated. *See also* Wayne R. LaFave, *Search and Seizure* § 3.4(a) (4th ed. 2004) (noting that corroboration is generally not essential when an average citizen reports a crime based on personal observations, and that in such cases reliability may generally be presumed). (The Court notes that the Peterson's complaint was later corroborated by a veterinarian. *See* Memorandum from Rex Anderson, DVM to Mathew Johnson, dated October 14, 2011. (Doc. 20, App. 133).) The Peterson complaint alone was sufficient to show probable cause, but additional corroboration was also provided in the search warrant application by

---

[2]  At the October 10, 2012, suppression hearing, defense counsel stipulated that the information in the application for search warrant is correct as to Bill Peterson and that the Mr. Peterson would testify to matters as described by Dep. McFadden in the application for search warrant.

the observations of Dep. Hildebrand on June 10 and 11, and August 13, 2011.

Defendant has presented this Court with a list of minor inaccuracies in the search warrant application.[3] However, none of the alleged inaccuracies rise to the level of deliberate falsehoods or recklessly misleading statements. *See Franks v. Delaware*, 438 U.S. 154 (1978). Moreover, the remainder of the affidavit, which is clearly not inaccurate, is adequate to support probable cause. The centerpiece of the affidavit is the Petersons' complaint, and it is amply corroborated by the recitation of Dep. Hildebrand's observations from recent visits to the kennel. No error or inaccuracy infects the Peterson/Hildebrand allegations contained in the search warrant application.

---

[3] Defense counsel makes overly much of the fact that the application states that there were "five other written reports by other deputies in this office concerning animal neglect.. . ." (App. 65.) As Dep. McFadden testified, there was a miscommunication between him and the County Attorney that resulted in this inaccurate statement in the application. A correct statement would have been that there were two written reports generated by deputies and three computer-aided dispatch reports based on complaints telephoned into JCSO by concerned citizens. In point of fact, however, and contrary to Defendant's assertions, there *was* a long-standing problem indicating potential animal cruelty at Defendant's kennel, and the problem had indeed existed for years. Dr. Geske's one-time visit to the kennel in 2009 did not absolve the kennel vis-a-vis all past and future reports of animal cruelty by concerned citizens, *of which there were many*. In addition, the influx of complaints in 2011 indicated potential deterioration at the kennel, which was actually verified by Dep. Hildebrand's visits.

Nor is there any significant omission that undercuts a finding of probable cause. Law enforcement need not include every piece of information in its possession in the application for a search warrant. "The omission of facts rises to the level of misrepresentation only if the omitted facts 'cast doubt on the existence of probable cause.'" *United States v. Johns*, 948 F.2d 599, 606-07 (9th Cir. 1991).

Defendant claims that the application misrepresents the circumstances surrounding the kennel because the application does not state that a veterinarian had examined his dogs for the JCSO in 2009, and found no neglect at that time. However, according to the testimony of Dep. Hildebrand, the JSCO knew that the kennel was borderline in 2009 because the veterinarian at that time stated that the conditions were undesirable. Furthermore, Chilinski told Dep. Hildebrand that he had recently lost his only assistant at the kennel. With the passage of time and a reduction in kennel staffing, a two-year-old finding of 'no neglect' became irrelevant. In the face of the obviously deplorable conditions at the kennel in 2011 and the Peterson's complaint, the fact that a veterinarian had once found no neglect would not have cast doubt on the existence of probable cause in 2011. Therefore the omission of the fact of the 2009 veterinarian examination did not rise to the level of a misrepresentation in the application for search warrant.

The Court concludes that the issuing judge had ample substantial basis under the totality of the circumstances to find probable cause to believe that a search of Chilinski's premises would reveal evidence of the crime of animal cruelty. The JCSO was properly on the Chilinski property when scores of marijuana plants were discovered. The SWMDTF search warrants were amply supported by probable cause to search for evidence of a crime.

Defective Address on Search Warrant

The Court rejects Defendant's suggestion that the evidence seized be suppressed because the address on the search warrant was allegedly defective. The location to be searched on the search warrant is stated to be:

> 275 S. Main, Malamute Way, Jefferson City, Jefferson County, MT, including all of Section 13, Township 07 N, Range 04 W, Fraction #8279, Stock well #8275, Skeels #8277, and Sanford #8276.

(Doc. 20, App. 64, 83, 98.) Nothing is incorrect in this address or property description. JCSO officers had been to the Chilinski property numerous times over a period of years, and neither they nor the SWMDTF personnel had any difficulty locating the property to execute the search warrants. Nevertheless, Defendant alleges that the location description was defective because it did not list the property as being located at "141 Malamute Way."

Search warrants must describe particularly the place to be searched.  U.S. Const. Amend. IV.  It is enough, however, "if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended."  *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 69 L.Ed. 757 (1925).  In addition, there must not be a "reasonable probability" that officers executing the search "may mistakenly search another premise."  *United States v. Mann*, 389 F.3d 869, 876 (9th Cir. 2004) (citations omitted).  The address provided by the warrant was correct and reasonable.  Despite the omission of the "141" numeric portion of the address, there was no genuine issue as to the ability of law enforcement officers to find Defendant Chilinski's residence because the address was reasonable for a rural location, and JCSO officers had been there before on one or more occasions.  All of the officers drove directly to Defendant's premises without any confusion.  Defendant's argument is without merit.

Overbreadth Argument.  The Court rejects Defendant's argument as to the alleged overbreadth of the animal cruelty search warrant.  Defendant objects to the fact that all the dogs were to be seized instead of only the dogs that "evidenced signs of cruelty." (Doc. 23 at 9.)   However, it is obvious that the JCSO personnel are not veterinary experts who can examine dogs and evaluate them for abuse or

neglect. Only seizing some animals and leaving others was not a reasonable option for the JCSO. The JCSO seized all the dogs for examination by a panel of veterinary experts.

The specificity requirement for the things to be seized must depend on the nature and "the circumstances of the case and the type of items involved." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). The procedures utilized in this case for search and seizure of the dogs were appropriate under the circumstances, and the fact that some of the dogs were later deemed healthy does not negate the appropriateness of seizing all of the dogs and then having them evaluated for abuse and neglect by a panel of experts. As a practical matter, given that Defendant Chilinski was arrested and jailed for a two-week period beginning on October 12, the JCSO had no choice but to seize all of the dogs, if only to make sure they were fed while Defendant was incarcerated. Certainly, JCSO could not leave any dogs at the kennel unattended after Defendant's arrest.

Use of HSUS/LCHS Volunteers. The Court rejects Defendant's contention that JCSO's use of volunteers Humane Society of the United States ("HSUS") and Lewis and Clark Humane Society ("LCHS") violated the Fourth Amendment. The Court accepts the testimony of Sheriff Doolittle and Dep. McFadden on this point.

The evidence shows that JCSO controlled the execution of the search warrant, but in doing so it utilized the assistance of numerous HSUS/LCHS volunteers.  This was perfectly appropriate given the circumstances surrounding the difficult task of seizing some 160 animals, most of which were large and some of which were potentially dangerous.  Defendant's argument citing *Wilson v. Layne*, 526 U.S. 603 (1999), is inapposite to this case.  The JCSO controlled the search and seizure operation and directed the actions of the volunteers, who were present merely to aid JCSO in its execution of the search warrant.

2.  Motion to Suppress Statement.

On the morning of Defendant Chilinski's arrest for animal cruelty, October 12, 2011, Dep. Hildebrand transported Defendant to the Jefferson County Detention Center.  Chilinski made a voluntary statement "that he had a medical marijuana card, and he was applying for a caregiver card.. . . [Chilinski] further stated that he had marijuana plants in the house." (Doc. 20, App. 78.)  Dep. Hildebrand replied, "How many?" (Doc. 20, App. 78.)  Chilinski said, "Five plants. . . ."  The government concedes that the latter statement may properly be suppressed because Defendant had not yet been Mirandized.  The Court notes also

that the suppressed statement is not accurate (the government having discovered 300 marijuana plants on Defendant's property).

However, on October 13, 2012, after Defendant was Mirandized, Defendant made another statement to Undersheriff Mike Johnson. This time, Defendant stated that he used marijuana, he was trying to become a caregiver, he had previously been a caregiver, he had started growing larger plants in January, and the smaller plants were to replace the harvested plants. (Doc. 20, App. 97.) This statement need not be suppressed as it was properly Mirandized. (Doc. 20, App. 96.)

Conclusion

Having found that the decisions of the issuing judges to issue the three search warrants in this case were not clearly erroneous and having found no error in the applications for or the execution of the search warrants, Defendant's motion to suppress evidence must be denied. The government concedes that Defendant's brief statement (admitting to possession of five plants) on October 12, 2012, should properly be suppressed. All other statements made by Defendant Chilinski were obtained by law enforcement officers without constitutional violation and

need not be suppressed.

Accordingly,

IT IS HEREBY ORDERED that Defendant's Motions to Suppress (Doc. 22, Doc. 24) are DENIED.

DONE and DATED this 23rd day of October, 2012.


CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE